# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

KURT MELVIN REISINGER,

                                        Plaintiff,

                    -v.-                                7:16-CV-428
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

CHRISTOPHER CADIN, ESQ., Legal Services of CNY, Attorney for Plaintiff
JOSHUA LENARD KERSHNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,
pursuant to the Social Security Pilot Program, N.D.N.Y.G.O. # 18, in accordance with
the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and
the consent of the parties. (Dkt. Nos. 2, 4, 5).

## I.    PROCEDURAL HISTORY

On or about August 29, 2012, plaintiff protectively[1] filed an application for
Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"),
alleging disability beginning December 31, 2010. (Transcript ("T") 146-52, 153-58,
168).  Plaintiff's applications were denied initially on December 5, 2012, and plaintiff
requested a hearing. (T. 77-84, 85).  The video hearing was held on February 10, 2014

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing"
indicates that a written statement, "such as a letter," has been filed with the Social Security
Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630,
416.340.  There are various requirements for this written statement. *Id.*  If a proper statement is filed,
the Social Security Administration will use the date of the written statement as the filing date of the
application even if the formal application is not filed until a later date.

before Administrative Law Judge ("ALJ") John M. Lischak, during which plaintiff testified. (T. 35-63). The ALJ denied plaintiff's applications in a decision dated August 11, 2014 (T. 17-30), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 9, 2015. (T. 1-5).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is

2

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents him from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

Defense counsel states that he incorporates by reference the summary of the procedural history and the "statement of facts" in plaintiff's brief, "with the exception of any arguments, inferences, or conclusions." (Def.'s Br. at 1-2) (Dkt. No. 19). Defense counsel further incorporates the procedural history and facts as provided in the ALJ's opinion. (*Id.* at 2). Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

# IV.   THE ALJ's DECISION

After finding that plaintiff had not engaged in substantial gainful activity from the alleged date of onset to the time of the hearing, the ALJ found at step two of the disability analysis, that plaintiff had the following severe impairments: (1) "residuals status post work injury of the low back with herniated discs at several levels and radiculopathy," and (2) morbid obesity. (T. 20-24).  In addition, the ALJ found that plaintiff's finger injury, neck problems, knee pain, and mental impairment were not "severe" within the meaning of the regulations. (T. 23-24).  The ALJ also noted that the non-severe physical impairments were not expected to last for a period of twelve months or more at the requisite level of severity. (*Id.*)

At step three of the sequential evaluation, the ALJ found that plaintiff's severe impairments did not meet or equal the severity of a Listed Impairment, notwithstanding plaintiff's argument to the contrary in a letter submitted prior to the hearing. (T. 24-25, 126-29).  Specifically, the ALJ considered Listing 1.04 (Disorders of the Spine). (*Id.*) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04) ("Listing 1.04").

At step four, the ALJ found that plaintiff had the RFC to perform a "limited range of sedentary work." (T. 25).  Plaintiff's limitations included frequently lifting and carrying up to ten pounds and occasionally lifting and carrying up to fifty pounds. (T. 25).  The ALJ found that plaintiff could stand for a total of thirty minutes at one time without interruption, and he could walk a total of five minutes at one time without interruption. (T. 25-26).  Plaintiff could sit for a "total of six hours in an eight hour workday" and could stand and walk for a total of one hour each in an eight hour

workday. (T. 26). The ALJ found that plaintiff could occasionally reach overhead and push/pull with his right and left hands, he could frequently reach in all other planes, and he could handle, finger, and feel with both hands. (*Id.*) Plaintiff could frequently operate foot controls with both feet, could occasionally climb stairs and ramps, stoop, kneel and crouch and could frequently balance. (*Id.*) However, he could never crawl or climb ladders or scaffolds. (*Id.*)

Because of limitations that would prevent plaintiff from performing a full range of sedentary work, the ALJ sent an Interrogatory to a Vocational Expert ("VE"), outlining two hypothetical questions based upon RFC evaluations submitted by Physical Therapist ("PT") Randy Lehman and Medical Expert, Orthopedic Surgeon Malcolm Brahms. (T. 29-30, 227-33). The VE responded in a report, dated May 21, 2014, that based on the RFC evaluation, and under either hypothetical question proposed by the ALJ, plaintiff could not perform his previous work. (T. 229, 231). However, plaintiff could still perform alternative work that existed in significant numbers in the national economy.[2] (T. 229, 232). Based on the VE's answers, the ALJ found that plaintiff was not under a disability at any time through the date of his decision. (T. 29-30).

## V.  ISSUES IN CONTENTION

Plaintiff advances the following arguments:[3]

---

[2] In fact, the VE listed the same jobs in her response to both hypothetical questions. (T. 229, 232).

[3] The court has reversed the order of plaintiff's arguments because success at step three would obviate reaching step five of the sequential analysis.

(1)     Plaintiff's impairments meet or equal the severity of Listing 1.04. (Pl.'s Br. at 17-19) (Dkt. No. 9).

(2)     The VE's opinion is not supported by the DOT/ONET,[4] "nor clarified," and the "job estimates are beyond the substantial evidence of the record. (Pl.'s Br. at 7-17).

Defendant argues the Commissioner's determination is supported by substantial evidence, and that the complaint should be dismissed. (Def.'s Br. at 6-17) (Dkt. No. 19). For the following reasons, the court agrees with defendant and will recommend dismissal of the complaint.

## VI.  <u>LISTED IMPAIRMENT</u>

### A.  **Legal Standard**

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments. *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

---

[4] Plaintiff does not define "ONET." However, an internet search reveals that O*NET is another source of occupational information. https://www.onetcenter.org/overview.html. Although the court is not questioning its use by the plaintiff, O*NET is not listed in the regulations as one of the sources of which the agency takes administrative notice. *See* 20 C.F.R. § 404.1567(d)(1)-(d)(5).

## B.     Application

In this case, plaintiff argues that his impairments meet or equal the severity of Listing 1.04.  Plaintiff's brief lists a variety of signs and symptoms which relate to plaintiff's back impairment, but does not correlate these signs and symptoms to the requirements of Listing 1.04.  First, the court notes that Dr. Brahms specifically stated that plaintiff's impairments did not meet or equal any impairment described in the Listing of Impairments. (T. 468).  Dr. Brahms's February 28, 2014[5] summary states that he reviewed the plaintiff's medical records, and that plaintiff's March 2013 MRI, supported by a 2012 EMG, revealed evidence of a herniated disc at several levels. (T. 469).  However, the physical examination did not indicate "objective positive findings save for an inconsistent SLR sign."[6] (*Id.*)  Over the plaintiff's objections, the ALJ relied on Dr. Brahms's assessment in finding that plaintiff did not meet the requirements of a Listed Impairment.[7] (T. 25).

No treating health professional has opined that plaintiff's impairments are of listing severity.  Plaintiff essentially asks the court to re-weigh the medical evidence and find that the ALJ's determination is not supported by substantial evidence.

---

[5] Dr. Brahms submitted the response to the ALJ's interrogatory after the hearing, and plaintiff was given the opportunity to review and comment on the doctor's findings. (T. 213-14).

[6] SLR refers to Straight Leg Raising.  "The Straight Leg Raising (SLR) test has been used as the primary test to diagnosis lumbar disc herniations . . . ."  Majlesi J, Togay H, Unalan H, Toprak S., *The sensitivity and specificity of the Slump and the Straight Leg Raising tests in patients with lumbar disc herniation*, http://www.ncbi.nlm.nih.gov/pubmed/18391677 .

[7] The ALJ also pointed out that plaintiff's representative had the opportunity to challenge Dr. Brahm's findings and to request a supplemental hearing, but did not do so. (T. 25).  Although plaintiff's representative "attempted" to do so by recontacting the plaintiff's treating specialist, her attempt was unsuccessful because that physician declined to submit a medical questionnaire. (*Id.*)

Resolving conflicts in the evidence is the province of the ALJ. *Vein v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing *Richardson v. Perales*, 402 U.S. at 399). *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (the court must defer to the Commissioner's resolution of conflicting evidence).

Plaintiff does not cite the specific section of Listing 1.04 that he meets. In order to meet or equal the severity of a Listing 1.04, the plaintiff must have a "disorder of the spine," defined as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." Listing 1.04. However, in addition to the above, there must also be existence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine). Listing 1.04(A).

To meet Listing 1.04(B), plaintiff must have spinal arachnoiditis,[8] confirmed by an operative note or pathology report of tissue biopsy or by appropriately medically acceptable imaging, manifested by severe burning or painful disesthesia, resulting in the need to change position or posture more than once every two hours. Finally, in order to meet Listing 1.04(C), plaintiff must have lumbar spinal stenosis, resulting in pseudoclaudication, established by findings on appropriate imaging, manifested by

---

[8] Although plaintiff states that he must change position frequently, this section of the Listing does not apply because plaintiff has never been diagnosed with spinal arachnoiditis. Thus, the only possible sections applicable to plaintiff would be 1.04(A) or (C).

chronic non-radicular pain and weakness and resulting in an inability to ambulate effectively as defined in section 1.00(B)(2)(b). The inability to ambulate effectively means an "extreme" limitation of the ability to walk, one that "interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. § 1.00(B)(2)(b)(1). In order to meet this Listed Impairment, plaintiff's lower extremity functioning must be insufficient to permit independent ambulation without the use of a handheld assistive device that limits the functioning of both upper extremities. *Id.*

There is no question that plaintiff exhibits some of the required signs and symptoms required by Listing 1.04. On May 15, 2012, plaintiff was examined by NP Christopher Grundowski, who stated that plaintiff's MRI showed multilevel discogenic changes and multiple disc extrusion. (T. 299). "Most significantly," plaintiff had central canal stenosis and a moderate degree of deformity of the anterior thecal sac with extruded disc material compressing on the L5 nerve root. There was also a moderate to large broad based annular bulge with central disc extrusion, extruded disc material causing a concave anterior deformity of the anterior surface of the thecal sac, causing moderate central stenosis. This is also reflected to a lesser extent in L2-L3, L1-L2. (*Id.*) He had decreased range of motion in his lumbar spine with paraspinal spasm noted. (T. 299). NP Grundowski stated that SLR was "essentially positive about 20 degrees, but not significant." (*Id.*) Plaintiff walked "stiffly," but was able to walk on his toes and heels. (*Id.*)

On June 6, 2012, plaintiff was seen by NP Grundowski, who stated that there was

"decreased" range of motion of the lumbar spine and some paraspinal spasm noted. (T. 301). SLR was positive at 30 degrees, more on the left side than the right side. (*Id.*) Plaintiff was referred to North Country Ortho Spine for an appointment on June 19, 2012. (*Id.*) While NP Grundowski found positive SLR, he also stated that it was "not significant," and subsequent treating professionals found negative SLR findings as stated below.

On June 19, 2012, shortly after NP Grundowski's June 6, 2012 examination, plaintiff was examined by Physician Assistant (PA) Michael K. McElheran.[9] (T. 251-52). Plaintiff told PA McElheran that if he lifted more than 50 pounds, it would significantly worsen his symptoms. (T. 251). PA McElheran noted that plaintiff walked with a normal gait that was not wide-based. (T. 252). He could walk on his heels and toes "without difficulty," SLR was negative bilaterally, and clonus[10] was negative bilaterally. (*Id.*) Deep tendon reflexes were trace at the knees and ankles, and muscle strength seemed "grossly 5 out of 5, equal and symmetrical in the major muscle groups." (*Id.*) Although plaintiff noted pain going down his legs, he denied "weakness." (T. 252). He could sense light touch, and there was no pain with internal and external rotation of the hips. (*Id.*)

On June 28, 2012, plaintiff noted persistent back pain, and although he did not complain of "frank weakness in the legs," he related "more so pain related weakness."

---

[9] This, and several other of PA McElheran's reports are co-signed by Dr. Bruce Baird, M.D. (T. 252). The court notes that the actual provider was the PA, because in the section entitled "Recommendations," it states "at some point he may need an evaluation by Dr. Baird." (*Id.*)

[10] Clonus is defined as involuntary and rhythmic muscle contractions. https://www.ncbi.nlm. nih. gov/pubmed/25669332.

(T. 253). However, his physical examination did not reveal any definite weakness on strength testing in his lower extremities. Patellar Achilles and medial hamstring reflexes were symmetric, although medial hamstring pulses were "quiet." Plaintiff denied loss of sensation, and SLR was negative on the left and "somewhat provocative" on the right." (*Id.*) The "impression" was mild or early right lumbar radiculopathy, more so affecting the L5 root, but there were no other definite findings of lumbosacral radiculopathy, plexopathy, peripheral mononeuropathy, large fiber polyneuropathy, or myopathy. (T. 253, 255, 257). Discogenic changes were noted on MRI with associated central and foraminal stenosis. (T. 253, 258-59).

On July 16, 2012, plaintiff's examination showed "a patient who walks with a normal gait." (T. 389). He used no assistive devices, and sat comfortably on the examination table. (*Id.*) On September 19, 2012, plaintiff walked with a slow gait. (T. 390). SLR was "irritable" to the right and negative to the left (with no indication of whether it was seated or supine). (*Id.*) Deep tendon reflexes were "trace" at the knees and "trace" at the ankles. (*Id.*) On January 18, 2013, plaintiff walked with a slow gait, but he could walk on heels and toes, and his gait was not wide-based, he used no assistive devices, and he could get on and off the examination table. (T. 391). SLR was "irritable" bilaterally. (*Id.*) On March 13, 2013, plaintiff walked with a slow gait, and could walk on his heels and toes, even though this activity increased the pain in his back and legs. (T. 392). He had "some distress secondary to pain," and his SLR was "irritable" on the right and negative on the left. There was no appreciable clonus on examination, and his muscle strength was "grossly 5/5 equal and symmetrically in the

major muscle groups, and deep tendon reflexes were 1 at the right knee, 1+ at the right ankle, 1 at the left knee, and trace at the left ankle. There was no pain with internal and external rotation of the hips. (*Id.*)

On November 2, 2012, plaintiff had a consultative examination performed by Elke Lorensen, M.D. (T. 313-16). Plaintiff told Dr. Lorensen that he was able to cook daily, clean once or twice per week, do laundry once or twice per week, and shop one or two times per week. (T. 314). He was able to shower three to four times per week and dress himself daily. (*Id.*) He stated that he watched television, listened to the radio and socialized with friends. (*Id.*) Dr. Lorensen found that plaintiff was in no acute distress, his gait was normal, he could walk on his heels and toes "without difficulty," but he told Dr. Lorensen that he could not squat. (*Id.*) His stance was "normal," he used no assistive devices, and had no trouble getting on and off the examination table and rising from a chair. (*Id.*)

Dr. Lorensen also found that plaintiff had full range of motion in his cervical spine. Plaintiff's lumbar spine flexion was 40 degrees, extension was 5 degrees, and lateral flexion and rotation was 15 degrees bilaterally. (T. 315). SLR was negative bilaterally, forward elevation and abduction of the shoulders was 130 degrees. Plaintiff had full range of motion of the elbows, forearms, and wrists. Hip flexion on the right was 50 degrees on the right and 75 degrees on the left. Plaintiff's right knee flexed 130 degrees, and his left flexed 140 degrees. He had full range of motion in his ankles, his joints were stable and non-tender.

Most importantly for purposes of the Listings, plaintiff's deep tendon reflexes

were physiologic and equal in both lower and upper extremities. (*Id.*) There were no sensory deficits, and strength was 5/5 in both upper and lower extremities. No muscle atrophy was evident in his extremities. His hand and finger dexterity were intact, and his grip strength was 5/5 bilaterally. (*Id.*)

On April 19, 2013, plaintiff stated that he continued to have symptoms with normal day to day activities and that he had to make "frequent position changes." (T. 395). His new MRI was "essentially unchanged" but did show central stenosis at "2-3, 3-4 and a lesser degree at 4-5 and 5-1." (T. 395). At "5-1", there was facet hypertrophy and some increased foraminal narrowing mainly to the right side. He had radiculopathy, noted on nerve studies. Plaintiff walked with a "slow gait," slightly favoring the right, but used no assistive devices. There was no appreciable clonus, and SLR was "irritable" on the right and "equivocal" on the left. (*Id.*)

On May 20, 2013, plaintiff walked "with a normal gait," and did not use assistive devices. (T. 400). Deep tendon reflexes were "trace" in the upper extremities, and no appreciable clonus. (*Id.*) Plaintiff's "symptoms were controlled with activity modification," and plaintiff stated that he wished to hold off on therapy. Plaintiff had an MRI of his neck, which was "relatively unremarkable." (*Id.*) Plaintiff had "no real arm symptoms" and was not dropping items. (*Id.*)

On May 30, 2013, plaintiff was examined by Dr. Bruce Baird, M.D. (T. 401). Dr. Baird stated that, upon clinical examination, plaintiff was alert, oriented, and cooperative, with appropriate mood and affect. He was 6'2" tall and weighed 325 pounds. He had negative SLR, +1 reflexes in the knees and ankles. Plaintiff had no

pain with rotation of the hips, and his sensation was "neurologically intact" in the lower extremities. (*Id.*) Dr. Baird reviewed plaintiff's MRI which revealed degenerative changes and a small to moderate disc bulge on the right "2-3," a right-sided disc bulge at L3-4, mild to moderate central stenosis at L4-5, right sided disc bulge at L5-S1. (*Id.*) Dr. Baird stated that electrodiagnostic studies revealed "mild to early right lumbar radiculopathy affecting the L5 nerve root." (*Id.*) Dr. Baird suggested that plaintiff lose 95 pounds prior to considering any type of surgical procedure. (*Id.*)

On November 5, 2013, plaintiff was examined by Nurse Practitioner ("NP") Karin Hall of Carthage Medical Center. (T. 407-409). She noted that plaintiff did not appear to be in any pain, and there was no evidence of "significant distress." (T. 409). He had no cyanosis, clubbing, or edema, and his distal pulses were present and equal. (T. 409). Cranial nerves were grossly intact bilaterally. (*Id.*) Plaintiff was encouraged to lose weight and begin an exercise program to support strengthening his back and alleviating knee pain "etc." (T. 409). The court also notes that NP Hall examined plaintiff in July of 2013. (T. 410-12). In that report, NP Hall stated that one month prior, plaintiff had injured his finger "swinging on a rope swing jumping into a lake." (T. 410). He caught his finger in the rope, causing it to "pop out," causing him pain and limited mobility. (*Id.*) However, the court notes that swinging on a rope and jumping into a lake is not the kind of restricted mobility that is the basis for finding a Listed Impairment.

On February 12, 2014, plaintiff walked with a slow, but not "wide-based" gait. (T. 474). He made frequent position changes during the examination, and his deep

tendon reflexes were "trace" in the upper and lower extremities, but no Hoffman's[11] or clonus was noted. (*Id.*) Examination of plaintiff's knees showed patella grind, but good range of motion with "some" irritability on extremes. (*Id.*)

It is the plaintiff's burden at step three to show that he meets the above criteria, and plaintiff must meet all the requirements of the particular Listing. Plaintiff has not cited to the report of any medical professional who states that he meets a Listed Impairment, whereas defendant's expert specifically states that plaintiff does not meet any Listing. While plaintiff may have some of the signs and symptoms, he does not have all of them in sufficient severity to meet the listings according to Dr. Brahms, whose finding is supported by substantial medical evidence in the record. Any conflicts in the record were for the ALJ to resolve.

Plaintiff argues that if his obesity is factored into the analysis, as it must, then he meets the severity of a listed impairment. The ALJ in this case specifically considered plaintiff's obesity in his decision (T. 28), and although Dr. Brahms did not indicate his specific rationale for declining to find a listed impairment, it is clear from his summary that plaintiff's obesity was taken into account. (T. 469). The ALJ's determination that plaintiff's impairments did not meet or equal the severity of a Listed Impairment is supported by substantial evidence.

## VIII. <u>RFC</u>

### A.    **Legal Standards**

RFC is "what [the] individual can still do despite his or her limitations.

---

[11] Hoffman's Sign is used to predict cervical spinal cord compression. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1888193/

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

Although plaintiff does not specifically challenge the ALJ's RFC determination

in a separate point, the court notes that plaintiff argues that he has a sit/stand requirement in his step five argument. There are two relevant RFC evaluations in the record, upon which the ALJ stated that he was relying. One was dated December 18, 2013, written by PT Lehman. (T. 432-37). The other RFC was supplied by medical expert, orthopedic specialist, Dr. Brahms. (T. 461-66). PT Lehman's RFC was written in conjunction with a Functional Capacity Evaluation, during which PT Lehman specifically tested plaintiff's abilities. (T. 423-30). Dr. Brahms RFC was written after the doctor reviewed the medical records and was not accompanied by a physical examination of the plaintiff.

The ALJ stated that "the evaluation by the physical therapist . . . is specific and entitled to evidentiary weight." (T. 27). In fact, the ALJ gave "the greatest evidentiary weight" to PT Lehman's report, "supplemented by the opinion of Dr. Brahms in the areas of assessment *not addressed by the physical therapist*." (T. 28) (emphasis added). In his statement of plaintiff's RFC, the ALJ included most of PT Lehman's restrictions, except for his determination that plaintiff could only sit for 30 minutes before having to stand, but did include the limitation that plaintiff could only stand for 30 minutes before having to change position and could only walk for 5 minutes at a time. (T. 25-26). The ALJ stated that plaintiff could "sit a total of six hours in an eight-hour work day." (T. 26). PT Lehman did find that plaintiff could sit for six hours in an eight-hour work-day, but also found that he could only sit for 30 minutes at a time. (T. 433). Dr. Brahms found that plaintiff could sit for four hours at a time, and could sit for six hours total in an eight-hour day. (T. 462). The ALJ did not reference either the 30 minute limitation

from PT Lehman's RFC or the 4 hour limitation on sitting from Dr. Brahm's RFC in the ALJ's RFC evaluation, other than to state that plaintiff could sit for six hours "total." (T. 25). But it was clear that the ALJ was relying on PT Lehman's evaluation because he found plaintiff could stand for only 30 minutes at a time, whereas Dr. Brahms found that plaintiff could stand for one hour at a time. Further, the ALJ stated that he was relying on PT Lehman and Dr. Brahms report was used to "supplement" in the areas "not addressed" by PT Lehman. Because PT Lehman did address the plaintiff's need to alternate sitting and standing every 30 minutes, the ALJ apparently relied on that finding. The omission of the thirty minute sitting limitation in the ALJ's RFC may not have been intentional.

To the extent that the ALJ may have erred in stating the plaintiff's RFC, his error will ultimately be found to be harmless. The court will assume that, according to PT Lehman, plaintiff needs to alternate between sitting and standing every thirty minutes.[12] Even if PT Lehman's entire RFC is adopted, the result of this analysis will be the same as discussed below.

_____

[12] Plaintiff argues that PT Lehman also stated that plaintiff "demonstrated" the ability only to "sit for 10 minutes, stand for 20 minutes, and intermittently stand, sit and walk for 120 minutes," and therefore, plaintiff could do less than the RFC indicated. However, PT Lehman also stated that the plaintiff "did not always demonstrate the biological and physiological changes normally observed with full volitional effort. Based on objective performance, subjective reports, and clinical observations, the results of this assessment may not be an accurate indication of [plaintiff's] present physical abilities." (T. 424). What PT Lehman appears to be saying is that, although plaintiff only "demonstrated" that he could perform certain functions, he did not always appear to be making full effort, and therefore, PT Lehman took that into account when completing the RFC evaluation. Thus, the court finds that PT Lehman's ultimate assessment is what he believed that the plaintiff was able to do.

## IX.  VOCATIONAL EXPERT and STEP FIVE

### A.  Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).  But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE").  *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations.  *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009).  Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper.  *Id*. at 276-277.

In addition, Social Security Ruling ("SSR") 00-4p provides that a vocational expert's testimony should generally be consistent with the occupational information contained in the Dictionary of Occupational Titles, and when there is an "apparent"

unresolved conflict, the ALJ must obtain a "'reasonable explanation for the conflict before relying on the [vocational expert's testimony].'" *See Murray v. Colvin*, No. 15-CV-6384, 2016 WL 5335545, at *13 (W.D.N.Y. Sept. 23, 2016) (quoting SSR 00-4p, 2000 WL 1898704 (SSA 2000) (alteration in original)).

## B.    Application

In this case, plaintiff argues that none of the jobs listed by the VE in the answer to the ALJ's interrogatory provide for the "sit/stand" option required by plaintiff. Plaintiff then lists each job, together with the requirements listed in the DOT. (Pl.'s Br. at 12-16). When the ALJ was determining plaintiff's RFC, he found that "no where is [the sit/stand] requirement found in the assessments made by Dr. Brahms or Mr. Lehman. This limitation is not justified by the record." (T. 28). However, as stated above, PT Lehman, to whom the ALJ gave great weight, found that plaintiff could only sit for 30 minutes at a time, stand for 30 minutes at a time, and walk for 5 minutes at a time. (T. 433).

The ALJ included that limitation in the first of two hypothetical that he sent to the VE, even though he did not include the 30 minute sitting limitation in the RFC stated in his decision. He did, however, include the 30 minute standing and 5 minute walking limitations that appear in Mr. Lehman's RFC evaluation. (T. 26). The ALJ apparently did not believe that sitting for 30 minutes and standing for 30 minutes was a "sit/stand option," otherwise, his statement does not make sense because he clearly adopted PT Lehman's restrictions and included them in his first hypothetical question.

In any event, regardless of the possible error that the ALJ may have committed

when he stated that a "sit/stand option" was nowhere in the RFC evaluations, and when he did not include the 30 minute sitting limitation in his RFC, any such error was harmless. *See Hawkey v. Commissioner of Soc. Sec.*, No. 5:15-CV-996, 2016 WL 6833059, at *4 (N.D.N.Y. Oct. 24, 2016) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (administrative legal error is harmless when the same result would have been reached had the error not occurred). The VE was asked to consider the sitting/standing limitation asserted by plaintiff, and the VE determined that there were still jobs that plaintiff could perform if he could only sit or stand for 30 minutes at a time. (T. 228, 229). In fact, the jobs listed by the VE are identical, whether plaintiff was required to change positions every 30 minutes or whether he could sit for 4 hours without interruption. (T. 228, 229, 230, 232). In addition, the VE specifically stated in response to one of the interrogatories, that her occupational evidence was not in conflict with either the DOT or the SCO.[13] (T. 233).

Plaintiff now argues that the jobs listed by the VE do not account for the plaintiff's "sit/stand" limitations because the DOT does not include reference to such limitations. In other words, plaintiff contends that the VE's testimony is inconsistent with SSR 00-4p, and the ALJ should have obtained an explanation for the "conflict" between the VE's testimony and the DOT. Many courts that have discussed this issue have determined that when the DOT does not specifically provide for a particular restriction, there is no "actual conflict" between the VE's testimony and the DOT, and

---

[13] SCO refers to a publication, entitled "Selected Characteristics of Occupations in the DOT." https://www.nosscr.org/sco/sco-ocr.pdf.

that before the VE is asked to "resolve a conflict," one must actually exist.[14] *Murray,*

*supra* (citing inter alia *Jasinski v. Barnhart*, 341 F.3d at 185; *Barone v. Colvin*, No. 15-

CV-2051, 2016 WL 4126544, at *12 (S.D.N.Y. Aug. 2, 2016); *Pitts v. Colvin*, No. 14-

CV-317, 2015 WL 3823781, *6 (W.D.N.Y. June 19, 2015) ("[h]ere, no such conflict

existed, because the DOT job description does not address the availability of a sit/stand

option[;] [t]hus, this does not contradict the vocational expert's testimony, which

endorsed such an option"); *Pahl v. Colvin*, No. 12-CV-3168, 2013 WL 3761545, *6

(W.D.N.Y. July 16, 2013) ("it is not error for the ALJ to rely on the VE's testimony of a

sit/stand option so long as there is no actual conflict between the VE's testimony and

the . . . DOT[;] [n]o such conflict existed here because the DOT does not address the

availability of a sit/stand option") (internal quotations omitted); *Diakogiannis v. Astrue*,

975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (finding no conflict between DOT and

vocational expert's testimony that plaintiff could perform positions despite inability to

---

[14] The court notes that in developing the Grids, the agency has already taken administrative notice of the information from the DOT and other occupational sources, in determining whether an individual who can perform a "full-range" of a particular exertional category of work can transition to substantial gainful employment that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1566(d), 404.1569, 404.1569a, 416.966(d), 416.969, 416.969a. The ALJ calls a vocational expert when the plaintiff cannot perform a full-range of such work, and resort to the Grids would be inappropriate to make the determination. *Id.* §§ 404.1566(e), 416.966(e). The purpose of the VE is to identify jobs that may be listed in the DOT or in other employment sources, that the plaintiff still could perform, notwithstanding his or her inability to do the full-range of work. Where there is an *actual* conflict between the VE's testimony and the DOT, it is logical to require the VE to explain why the plaintiff could still perform the particular job. However, when the DOT is silent, the VE's opinion may be based upon his or her own experience, and there is no "conflict" to resolve. In *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003), the Second Circuit stated that "[w]hereas the [DOT] describes jobs as they are generally performed, an expert is often called upon to explain the requirements of particular jobs, and as such, his deviations from the [DOT] in such testimony do not actually 'conflict' with the [DOT]. Many specific jobs differ from those jobs as they are generally performed, and the expert may identify those unique aspects without contradicting the [DOT]."

perform overhead reaching where DOT silent on overhead reaching); *Wellington v. Astrue*, No. 12 Civ. 3523, 2013 WL 1944472, *4 (S.D.N.Y. May 9, 2013) (proper inquiry is not whether ALJ inquired into potential conflicts with DOT, but whether there was actual conflict; "[b]ecause the DOT does not address the availability of a sit/stand option, it cannot contradict the vocational expert's testimony"); *Schmitt v. Astrue*, No. 5:11-CV-796, 2012 WL 4853067, *3 (N.D.N.Y. Oct. 11, 2012) (the DOT does not categorize or describe jobs by the requirement of being able to sit or stand at will; thus there is no conflict on that ground between the VE's testimony and the DOT); *Manning v. Astrue*, No. 5:11-CV-253, 2012 WL 4127643, *8 (D. Vt. Aug. 17, 2012) ("there was no 'conflict' between the [vocational expert's testimony and the DOT[;] [r]ather, the DOT did not apply, given that it does not provide a job addressing the particular hypothetical, including a sit/stand option"), *Rep't Rec. adopted*, 2012 WL 4127641 (D. Vt. Sept. 19, 2012); *Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720, 2008 WL 4793717, at *2 (N.D.N.Y. 2008) ("'expert [testimony] and the [DOT] conflict where they disagree[ ] in categorizing or describing the requirements of a job as it is performed in the national economy[;]' [t]he DOT's mere failure to mention every single characteristic of [plaintiff's] limitations in every job available for her does not constitute disagreement") (quoting *Jasinski v. Barnhart*, 341 F.3d at 184).

There are district court cases in this circuit, which have held that the DOT's silence as to a sit/stand option triggered a "duty" to resolve the conflict. *See Daragjati v. Colvin*, No. 14 Civ. 2727, 2015 WL 427944, at *10 (E.D.N.Y. Jan. 31, 2015) (citing *Patti v. Colvin*, No.13-CV-1123, 2015 WL 114046, *5-6 (W.D.N.Y. Jan.7, 2015)

(citing *Diaz v. Astrue*, No. 11-CV-317, 2012 WL 3854958, at *6 (D. Conn. Sept. 5, 2012) ("SSR 00–4p requires the ALJ to afford no room for conjecture where there is an apparent conflict between the VE's testimony and the DOT and a resolution by this Court would be unduly conjectural in the absence of clarification from the ALJ"); *Molina v. Colvin*, No. 13-CV-6532, 2014 WL 4955368, *9 (W.D.N.Y. Oct. 2, 2014); *Gallegos v. Colvin*, No. 13-CV-393, 2014 WL 4635418, *3-5 (D. Conn. Sept. 11, 2014); *Pettaway v. Colvin*, No. 12-CV-2914, 2014 WL 2526617, *12-13 (E.D.N.Y. June 4, 2014); *King v. Commissioner of Social Security*, No. 12-CV-277, 2013 WL 3967928, *4-7 (D. Vt. July 31, 2013).

This court does not agree with the reasoning in these cases. The analysis in *Gallegos* was based on a Ninth Circuit opinion. *See Gallegos*, 2014 WL 4635418, at *5 (citing *Coleman v. Astrue*, 423 F. App'x 754, 756 (9th Cir. 2011)). However, the Ninth Circuit is not binding on this court. Moreover, the Ninth Circuit itself has not been consistent in its analysis of the issue. *See Manley v. Colvin*, No. ED CV 16-1179, 2016 WL 7191541, at *3 (C.D. Cal. Dec. 12, 2016) (noting that there "is no controlling Ninth Circuit authority regarding whether the DOT's silence regarding a sit/stand option is in 'obvious or apparent' conflict with a vocational expert's testimony that a person requiring a sit/stand option can perform a particular job" - comparing *Coleman* with *Dewey v. Colvin*, 650 F. App'x 512, 514 (9th Cir. 2016) (holding that there was no conflict where the DOT was silent as to the sit/stand option). The district court in *Manley* agreed with the analysis in *Dewey*. *Id.*

This court finds that any error made by the ALJ in this case was harmless. The

ALJ could rely upon the VE's response to his interrogatory that plaintiff could perform the jobs listed, notwithstanding plaintiff's ability to only sit for 30 minutes and stand for 30 minutes.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: May 18, 2017

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**